United States Court of Appeals,

Eleventh Circuit.

No. 93-8474.

WARREN PUBLISHING, INC., Plaintiff, Counter-Defendant, Appellee,

v.

MICRODOS DATA CORP.;  Robert Payne, Defendants, Counter-Claimants, Appellants.

June 10, 1997.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:90-cv-1654-JOF), Owen Forrester, Judge.

Before HATCHETT, Chief Judge, TJOFLAT, ANDERSON, EDMONDSON, COX, BIRCH, DUBINA, BLACK, CARNES and BARKETT, Circuit Judges, and GODBOLD[*] and KRAVITCH[**], Senior Circuit Judges.

BIRCH, Circuit Judge:

This is an appeal from the district court's entry of a preliminary injunction[1] enjoining a putative infringer from infringing the compilation copyright of a publisher of a cable television factbook.  As a predicate for the injunction, the district court granted partial summary judgment for the copyright holder, finding that the copyright holder's system of selecting the names of communities under which to list the data in its factbook was sufficiently creative and original to warrant copyright protection.  Based on *Feist Publications, Inc. v. Rural Telephone Service Co.,* 499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991), as well as our application of *Feist* in *BellSouth*

[*]Senior U.S. Circuit Judge John C. Godbold elected to participate in this decision pursuant to 28 U.S.C. § 46(c).

[**]Senior U.S. Circuit Judge Phyllis A. Kravitch heard oral argument in this case on February 13, 1996 as a judge on active status.  She took senior status on December 31, 1996 and has elected to participate in this decision pursuant to 28 U.S.C. § 46(c).

[1]The district court granted Warren's motion for "permanent" injunction.  Warren's claim for unfair competition, as well as Microdos's counterclaims for defamation and trade disparagement, interference with contractual relations, and violation of Sherman Act by attempts to monopolize, however, all have yet to be addressed by the district court.  No final judgment was entered under 28 U.S.C. § 1291 because the court has not yet disposed of all the claims in the case and did not make its injunction a final judgment pursuant to Fed.R.Civ.P. 54(b).  Accordingly, the order before us is an interlocutory order for an injunction that is subject to review under 28 U.S.C. § 1292(a)(1).

*Advertising & Publishing Corp. v. Donnelley Information Publishing, Inc.,* 999 F.2d 1436 (11th Cir.1993) (en banc),[2] *cert. denied,* 510 U.S. 1101, 114 S.Ct. 943, 127 L.Ed.2d 232 (1994), we VACATE the injunction and REMAND for further proceedings.

## I. BACKGROUND

Warren Publishing, Inc. ("Warren"), compiles and publishes annually a printed directory called the *Television & Cable Factbook* ("Factbook"), which provides information on cable television systems throughout the United States. The Factbook contains two volumes, the "Station" volume and the "Cable and Services" volume. The focus of this case is the "Cable & Services" volume of the 1988 edition of the Factbook, and, in particular, the two sections of this volume entitled "Directory of Cable Systems" and "Group Ownership of Cable Systems in the United States." These sections are comprised of approximately 1,340 pages of factual data on 8,413 cable systems throughout the country and their owners.

The "Directory of Cable Systems" section contains extensive information on cable systems, including, *inter alia,* the name, address, and telephone number of the cable system operator, the number of subscribers, the channels offered, the price of service, and the types of equipment used. The entries in this section are arranged state by state in alphabetical order, and, within each state, all of the communities receiving cable television service are listed alphabetically. The "Group Ownership" section contains listings of selected information on "all persons or companies which have an interest in 2 or more systems or franchises." Factbook, Cable and Services Volume, at B-1301. The persons or entities listed in the group ownership section are known as multiple-system operators ("MSOs"), as contrasted with single-systems operators ("SSOs").

In the "Directory of Cable Systems" section, the factual data for each cable system is not printed under the name of each community that the cable system serves. The reason for this is that

---

[2]We note that the district court, in ruling on the summary judgment motions, did not have the benefit of our en banc opinion in *BellSouth.* At the time of the district court's order, the panel opinion in *BellSouth* had not yet been vacated by our grant of rehearing en banc, and thus the district court relied in part on the panel opinion. *BellSouth Advertising & Publishing Corp. v. Donnelley Info. Publishing, Inc.,* 933 F.2d 952 (11th Cir.1991), *vacated and reh'g en banc granted,* 977 F.2d 1435 (11th Cir.1992), *and on reh'g,* 999 F.2d 1436 (11th Cir.1993) (en banc), *cert. denied,* 510 U.S. 1101, 114 S.Ct. 943, 127 L.Ed.2d 232 (1994).

many communities are part of multiple-community cable systems, and it would be duplicative to list the same factual information under the individual community names for each community that comprises a multiple-community system. Therefore, a determination is made as to what community is the "principal" or "lead" (hereinafter "principal") community served by a particular cable system, and Warren prints the data only under the name of the principal community. Under the entries for the nonprincipal communities of a multiple-community cable system, there is a cross-reference to the principal community listing.[3] We note that, in many cases, a cable system is a single-community system, and thus there is only one possible principal community.

Microdos Data Corp. and Robert Payne ("Microdos") also market a compilation of facts about cable systems. Robert Payne is the principal officer and shareholder of Microdos. Microdos's compilation comes in the form of a computer software package called "Cable Access." The Cable Access program, like the Factbook, provides detailed information on both SSOs and MSOs. The district court described the format of Cable Access as follows:

> The Cable Access software package is broken into three databases. The first database provides information on the individual cable systems. This database is referred to as "the system database." The second database provides information on multiple system operators and is simply referred to as "the MSO database." The third database is a historical database which provides selected information on the cable industry from 1965 to the present....

> Defendant's Cable Access software package comes pre-sorted by state and city. The customer may rearrange the data in a format of its choosing. The customer may construct searches of the database's information on cable systems as required to fit its particular needs, as well as output the data to a hard copy in various formats, again to fit the specific needs of the customer.

---

[3]For instance, in the Georgia section of the book, Atlanta is designated as a principal community, with the factual data for the cable system serving Atlanta and the surrounding areas listed under the Atlanta heading. There are, however, numerous other communities served by the same cable system that serves Atlanta; under the names of these communities, it says, "See ATLANTA, GA." The following communities in north-central Georgia are cross-referenced to Atlanta in the 1988 Factbook: Alpharetta, Avondale Estates, Clarkston, College Park, Decatur, DeKalb County, East Point, Lithonia, Pine Lake, Sandy Springs, and Stone Mountain. In addition, Fulton County, although it has its own separate listing with factual data (since it is served by cable system different from that which serves Atlanta), also has a cross-reference that states "See also ATLANTA, GA." We infer from these listings that there are portions of Fulton County that are served by the cable system listed under the Fulton County heading, and that there are other portions of Fulton County served by the cable system listed under the Atlanta heading. The same holds true for DeKalb County, which is cross-referenced to both Atlanta and Chamblee, Georgia.

R4-36-3.

There is no dispute that Warren's Factbook predates the Cable Access program. Warren has been publishing cable television information since 1948, whereas Microdos began marketing Cable Access in 1989. Shortly after Warren became aware of the existence of the Cable Access software, it notified Microdos that it believed that the Cable Access program infringed its copyright in the Factbook.[4] In 1989, Microdos ceased marketing the original version of Cable Access, and, after some delay, began marketing a second version of Cable Access. Subsequently, a third and fourth version of Cable Access were marketed.

In July of 1990, Warren filed suit against Microdos, alleging copyright infringement and unfair competition.[5] Warren alleged that all four versions of Cable Access infringed upon its compilation copyright in the 1988 Factbook. Microdos counterclaimed for defamation and trade disparagement, tortious interference with contractual relations, and violations of Section 2 of the Sherman Act, based on Warren's alleged attempt to monopolize. Warren contended that Microdos infringed its compilation copyright in the Factbook in three areas: (1) the communities covered/principal community system, (2) the data fields, and (3) the data field entries. Following discovery, Warren and Microdos each moved for partial summary judgment on these three copyright infringement issues. With respect to the data fields issue, the district court found that Microdos had

---

[4]Warren registered its claim of copyright for the 1988 Factbook in July of 1988, and, in November of that year, the United States Copyright Office issued Warren a Certificate of Copyright Registration. Moreover, Warren annually registers its claim of copyright in the newest edition of the Factbook, and has been doing so since it began publishing the Factbook. It is not disputed that the Factbook *as a whole* is a factual compilation that is entitled to copyright protection. What is in dispute is whether Warren's method of presentation of facts under the principal community headings, with cross-references to the other communities served by that MSO, is entitled to copyright protection. As the Supreme Court held in *Feist,* the only protectable elements of a factual compilation are a compiler's selection, arrangement, or coordination, and these elements are protectable only if they possess the requisite originality. *Feist,* 499 U.S. at 348, 111 S.Ct. at 1289, 113 L.Ed.2d 358; *see also BellSouth,* 999 F.2d at 1440.

[5]In its complaint, Warren does not allege that the Cable Access program as a whole infringes its copyright in the Factbook. Rather, it is only the "system database" and the "MSO database" of the Cable Access software that Warren alleges infringes its compilation copyright.

not infringed Warren's data field format.[6]  With respect to the data field entries issue, the district court found that these entries were uncopyrightable facts, and therefore Warren's "sweat of the brow" argument on this issue could not prevail in light of the Supreme Court's *Feist* decision.[7]  Accordingly, the district court entered partial summary judgment for Microdos on these two issues.

The district court, however, reached a different conclusion on the communities covered issue. It found that the principal community system utilized by Warren in presenting the data on cable systems in its Factbook was "sufficiently creative and original to be copyrightable."  R4-36-11 (footnote omitted).  The district court then analyzed the selection of communities employed by Microdos and found it to be "substantially similar" to that of Warren.[8]  *Id.* 1992 WL 235745 at *5-7. Based on this finding, and its conclusion that Microdos failed to prove that it obtained its information from a source independent of the Factbook, the district court denied Microdos's motion for summary judgment on the principal community system and granted Warren's cross-motion on that issue.[9]  The district court subsequently denied Microdos's motion for reconsideration of the

---

[6]The district court found that Warren's selection of its data fields was not sufficiently original to warrant copyright protection.  As for the Factbook's coordination and arrangement of the data fields, the district court found that this was sufficiently creative and original to warrant copyright protection, but that Microdos's coordination and arrangement was not substantially similar to that of the Factbook.  Therefore, the district court granted Microdos's motion for summary judgment on the data fields infringement issue, and denied Warren's cross-motion for summary judgment on the same.

[7]Thus, the district court granted Microdos's motion for summary judgment on the data field entries infringement issue and denied Warren's cross-motion for summary judgment on that issue.

[8]The parties stipulated to the use of Illinois as a test or representative state for the purpose of the substantial similarity analysis.  Counsel for both sides agreed that the data records produced during discovery were most complete as to Illinois, and thus Illinois provided a common factual ground for the parties to present their respective arguments.  In addition, they agreed that the Illinois section of the Factbook fairly represented the factual circumstances throughout the Factbook.  Given the voluminous listings in the Factbook, we think that it was wise for the parties to limit the substantial similarity analysis to one representative state and have no doubt that limiting the analysis to Illinois has in no way restricted the parties' ability to present all of the legal issues relevant to the infringement issue.

[9]Microdos filed a motion for reconsideration of the district court's grant of summary judgment in favor of Warren on the principal community system issue.  The district court denied this motion and granted Warren's motion for permanent injunction and impoundment of the infringing materials.  Microdos permanently was enjoined from violating Warren's copyright in the Factbook "through the use, copying, distribution or selling of any version of [their] Cable

order and granted Warren's motion for a "permanent" injunction.[10]  The court "enjoined [Microdos] from violating [Warren's] copyright of the Factbook through the use, copying, distribution or selling of any version of [Microdos's] Cable Access products."  R6-42-4.  Microdos appeals the interlocutory order granting the injunction.[11]

## II. DISCUSSION

Microdos argues that the district court improperly granted Warren's motion for an injunction based on an erroneous ruling of law.  As a predicate for injunctive relief, the district court granted Warren's motion for partial summary judgment on the principal community system issue.  Microdos contends that the district court erred, as a matter of law, in finding the principal community system protectable under copyright law.

A. Review of Relevant Statutory Provisions and Case law

Because copyright law is principally statutory, we begin our analysis with a review of the pertinent statutory provisions.  In this case, we are dealing with a compilation, which the Copyright Act of 1976 (the "Act") defines as "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work *as a whole* constitutes an original work of authorship."[12]  17 U.S.C. § 101 (emphasis added). Section

---

Access products."  R4-42-4.  In addition, Microdos was directed to turn over to the clerk of the district court "all copies of and materials used to make any version of [their] Cable Access database products."  *Id.* Microdos complied with this order, turning over in excess of 20,000 pages of documents and research materials used to make its Cable Access product.

[10]Because no final judgment was entered by the district court, the injunction is by law a preliminary injunction.  *See supra* note 1.

[11]The judgment of the district court was affirmed by a panel of this court, but that panel decision was subsequently vacated by a grant of rehearing en banc.  *Warren Publishing, Inc. v. Microdos Data Corp.,* 52 F.3d 950 (11th Cir.), *vacated and reh'g en banc granted,* 67 F.3d 276 (11th Cir.1995).

[12]The phrase "as a whole" is highly relevant to our analysis of the originality and creativity of Warren Publishing's selection.  "Evaluation of the originality [and creativity] of selection should focus on the selection *as a whole.*"  Jane C. Ginsburg, *No "Sweat"?  Copyright and Other Protection of Works of Information After* Feist v. Rural Telephone, 92 Col. L.R. 338, 348 (1992). The dissent takes the position that original selection is present in Warren Publishing's selection of "principal communities" as a means of organizing the data although the data included in the compilation represent the entire universe of cable television systems.  The dissent's interpretation ignores the cross-referencing to all cable television systems in the compilation and, more

102 of the Act provides that "[c]opyright protection subsists, in accordance with this title, in *original works of authorship* fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 102(a) (emphasis added).  As a limiting principle, the Act states that "[i]n no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b).[13]

The Supreme Court, in its most recent decision focusing on compilation copyrights, noted that "[t]he *sine qua non* of copyright is originality." *Feist,* 499 U.S. at 345, 111 S.Ct. at 1287, 113 L.Ed.2d 358.  The Court emphasized that originality is a constitutional requirement, noting that the Constitution "authorizes Congress to "secur[e] for limited times to Authors ... the exclusive Right to their respective Writings.' " *Id.* at 346, 111 S.Ct. at 1288, 113 L.Ed.2d 358 (quoting U.S. Const. art. I, § 8, cl. 8).[14]  The Court also admonished that:

> Facts, whether alone or as part of a compilation, are not original and therefore may not be copyrighted.  A factual compilation is eligible for copyright if it features an original selection or arrangement of facts, but *the copyright is limited to the particular selection or arrangement.  In no event may copyright extend to the facts themselves.*

*Id.* at 350, 111 S.Ct. at 1290, 113 L.Ed.2d 358 (emphasis added).

---

importantly, fails to give meaning to the statutory phrase "as a whole."

[13]The dissent takes exception to the characterization of section 102(b) as a "limiting principle."  Dissent at 2162.  The dissent attempts to support this argument by making the unarguable points that section 102(b) is a codification of the idea/expression dichotomy and that use of the term "idea, procedure, process, system, method of operation, concept, principle, or discovery" to characterize expression does not itself preclude copyrightability.  Even given these unarguable points, Section 102(b), nonetheless, is a limiting principle and is "universally understood to prohibit any copyright in facts." *Feist,* 499 U.S. at 356, 111 S.Ct. at 1293, 113 L.Ed.2d 358.  Of course, section 102(b) does more than prohibit facts from being copyrighted;  it emphasizes that copyright protection does not extend to ideas procedures, processes, systems, methods of operation, concepts, principles, or discoveries.  Thus, if the expression is characterized as a "system," for example, it is not copyrightable *if the characterization is accurate.*

[14]The terms "authors" and "writings" as used in the Constitution have been interpreted definitively by the Supreme Court to "presuppose a degree of originality." *Feist,* 499 U.S. at 346, 111 S.Ct. at 1288, 113 L.Ed.2d 358.

Thus, the compiler's choices as to selection, coordination, or arrangement are the only portions of the compilation that arguably are even entitled to copyright protection. As the *Feist* Court noted, these choices must be made "independently by the compiler and entail a minimal degree of creativity"[15] in order to be entitled to compilation copyright protection. *Id.* at 348, 111 S.Ct. at 1289, 113 L.Ed.2d 358. The *Feist* Court further explained:

> This protection is subject to an important limitation. The mere fact that a work is copyrighted does not mean that every element of the work may be protected. Originality remains the *sine qua non* of copyright; accordingly, copyright protection may extend only to those components of a work that are original to the author.

*Id.* Given these limitations on the scope of copyright protection in a factual compilation, it is abundantly clear that "copyright in a factual compilation is thin." *Id.* at 349, 111 S.Ct. at 1289, 113 L.Ed.2d 358.[16] Only when one copies the protected selection, coordination, or arrangement in a factual compilation has one infringed the compilation copyright; copying of the factual material contained in the compilation is not infringement.[17]

B. The Principal Community System Employed by Warren

To establish its claim of copyright infringement, Warren must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist,* 499 U.S. at 361, 111 S.Ct. at 1296, 113 L.Ed.2d 358. The first element is not at issue here, because Microdos does not contest that the Factbook, *considered as a whole,* is entitled to copyright

---

[15]The Supreme Court further clarified that "a minimal degree of creativity" requires "more than a *de minimis* quantum." *Feist,* 499 U.S. at 363, 111 S.Ct. at 1297, 113 L.Ed.2d 358.

[16]There are three types of work that are entitled to copyright protection—creative, derivative, and compiled. Copyrights in these three distinct works are known as creative, derivative, and compilation copyrights. An example of a creative work is a novel. An example of a derivative work is a screenplay based on a novel; it is called "derivative" because it is based on a preexisting work that has been recast, transformed, or adapted. An example of a compilation is Warren's Factbook. The Act has created a hierarchy in terms of the protection afforded to these different types of copyrights. A creative work is entitled to the most protection, followed by a derivative work, and finally by a compilation. This is why the *Feist* Court emphasized that the copyright protection in a factual compilation is "thin." 499 U.S. at 349, 111 S.Ct. at 1289, 113 L.Ed.2d 358.

[17]This point is emphasized in section 103(b) of the Act, which states that "[t]he copyright in a compilation or derivative work extends only to the material contributed by the author to such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material." 17 U.S.C. § 103(b).

protection.[18]  To prove the second element, Warren must demonstrate that Microdos, by taking the material it copied from the Factbook, appropriated Warren's original selection, coordination, or arrangement.  *See BellSouth,* 999 F.2d at 1441.

The district court found that Warren's coordination and arrangement of the communities listed in the Factbook was "an obvious, mechanical, or routine task which required no creativity," and thus concluded that "the coordination and arrangement of the communities selected is not copyrightable."  R4-36-11.  That holding is not at issue on appeal.  The district court, however, agreed with Warren that "the selection of those communities was creative and protectable because Warren uses a unique system in selecting the communities that will be represented in the Factbook." *Id.* This system, so concluded the district court, was "sufficiently creative and original to be copyrightable."  *Id.* (footnote omitted).  The district court then employed "substantial similarity" analysis,[19] concluding that Microdos's selection of communities was substantially similar to that of Warren and therefore infringed Warren's compilation copyright.[20]  Based on this finding, the district court entered summary judgment for Warren on the principal community selection issue.

On appeal, the only issue before us is whether the district court abused its discretion in granting a preliminary injunction based on an erroneous ruling on the principal selection issue.  We review the district court's grant of a preliminary injunction for abuse of discretion.  *Zardui-Quintana v. Richard,* 768 F.2d 1213, 1216 (11th Cir.1985).  The district court abuses its discretion when it

[18]Microdos does strongly challenge, however, the district court's finding that Warren's system of selection of principal communities is copyrightable.

[19]The test for infringement of copyrighted works is one of "substantial similarity."  As the Second Circuit has noted, the substantial similarity inquiry is "narrowed" when dealing with a compilation.  *Key Publications, Inc. v. Chinatown Today Publishing Enters., Inc.,* 945 F.2d 509, 514 (2d Cir.1991).  It explained that "the components of a compilation are generally in the public domain, and a finding of substantial similarity or even absolute identity as to matters in the public domain will not suffice to prove infringement."  *Id.* Therefore, "[w]hat must be shown is substantial similarity between those elements, *and only those elements,* that provide copyrightability to the allegedly infringed compilation."  *Id.* (emphasis added).

[20]The district court found that there was a greater than 90% correlation between the principal communities in the Illinois section of the Factbook and the communities listed in the Illinois section of the Cable Access software.  The district court compared all four versions of Cable Access with the Factbook and found the correlation to range from 91.85% to 94.85%. R4-36-13-14.

grants a preliminary injunction in spite of the movant's failure to establish "(1) a substantial likelihood that [the movant] will ultimately prevail on the merits; (2) that [the movant] will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that the injunction, if issued, would not be adverse to the public interest." *Id.* Because we conclude that Warren failed to establish a substantial likelihood of success on the merits, we need not address the additional elements required for a preliminary injunction.

The district court found that "Warren has developed a *system for selecting communities* which is original in the industry. This selection process represents a part of the format of the compilation which is copyrightable." R4-36-16 (emphasis added). Since the district court concluded that Microdos had "substantially appropriated the copyrightable selection of communities portion of the format of Warren's Factbook," it held that "Microdos ha[d] infringed Warren's copyright in the Factbook." R4-36-30. The district court was correct in employing "substantial similarity" analysis once it concluded that Warren's system for selecting communities was copyrightable. Where it erred, however, was in concluding that Warren's system of selection was copyrightable in the first place.[21]

1. *Warren's "System" of Selection*

Section 102(b) of the Copyright Act specifically excludes "any idea, procedure, process, *system,* method of operation, concept, principle, or discovery" from copyright protection "regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b) (emphasis added). Nonetheless, the district court concluded that Warren's "system" of selecting communities was original and entitled to copyright protection. R4-36-16. This conclusion

---

[21]Since the district court erred in finding that Warren's system of selection was copyrightable, the substantial similarity analysis was unnecessary, for even verbatim copying of uncopyrightable matters is not infringement. As we noted in *BellSouth,* in the case of a factual compilation, the original elements of the compiler's work are compared with the corresponding elements of the putative infringer's work. 999 F.2d at 1445. In this case, Warren's system of selecting principal communities is not copyrightable; therefore, comparing this uncopyrightable selection with Microdos's system of selecting communities is pointless.

is contrary to the plain language of 17 U.S.C. § 102(b), and is clearly incorrect.[22] If Warren actually does employ a system to select the communities to be represented in the book, then section 102(b) of the Act bars the protection of such a system.

Even if we were to assume that the district court incorrectly denominated Warren's selection of communities as a "system," such an assumption would not validate the district court's finding of copyrightability. Warren contends that it has a unique method of choosing which communities to include in its directory, based on its "principal community" system. Warren defines a "cable system" as an entity offering subscribers in one or more communities the same cable services for the same price. As the district court found, "[t]he principal community, used to represent the entire cable system, is then selected by contacting the cable operator to determine which community is considered the lead community within the cable system. Other communities within the same cable system are then listed under the principal community, not independently."[23] R4-36-10. The Federal Communication Commission ("FCC"), unlike Warren, does not use a principal community system; rather, it lists individually every geographical community having cable service. As a result, if there are five communities served by one "cable system," Warren would list the system's data under the principal community name, and there would be cross-references under the listings of the names of the other four communities. The FCC, on the other hand, would list the data on all five communities

---

[22]The dissent is correct in arguing that use of the term "system" does not itself preclude copyrightability under section 102(b). Rather, because the characterization is accurate, Warren's "system" is not copyrightable because it is a system and systems are excluded from copyright protection under section 102(b).

[23]The district court's finding on this matter is inaccurate. Each community served in each state is listed separately in the Factbook; the principal community designation eliminates the need for Warren to reprint duplicative factual information about a cable system under every community that is part of the multiple-community system. Instead, under the nonprincipal community headings, it has a cross-reference in order to inform the reader of the principal community heading for that particular cable system. This directs the user where to find the factual data for a particular cable system. What the district court may have been attempting to explain is that in the Factbook, under the principal community listing, there is included an "also serves" entry, in which the names of all of the nonprincipal communities served by that multiple-community system are listed. This list identifies all of the communities that are cross-referenced to the principal community listing.

separately.[24]

At oral argument, Warren asserted, and the dissent agrees, that the district court was correct in finding that Warren is entitled to copyright protection in its "selection" of communities, which is based on its putatively unique definition of a cable system.  The problem with this is that Warren does not undertake any "selection" in determining what communities to include in the Factbook.  Warren claims that its system of listing communities does not include the entire universe of cable systems, and thus there is "selection" involved as to which communities they include in their Factbook.  This assertion, however, is plainly wrong.

The district court found that the FCC, which attempts to list individually every community across the country with a cable system, had 724 communities listed for Illinois.  R4-36-12.  Warren, it observed, listed 406 communities under its principal community concept.  *Id.*  It did note that "[n]umerous additional communities were listed under the various principal communities," but stated that they were not separately listed.[25]  *Id.*  Given that Warren did not list all of the communities that the FCC did, the district court concluded that Warren did "select" which communities to include in the Factbook, and thus its selection was copyrightable.  In an unintentionally prescient footnote, however, the district court noted that:

> This is not to say that the selection of cable systems would be copyrightable in all cases.  Had Warren selected every cable system listed by the F.C.C., then there would not be sufficient originality in the "selection" to warrant copyrightability.

*Id.* at 11 n. 9.  Yet, this is precisely what Warren did.  The district court made the mistake of comparing the number of principal communities listed with the number of individual communities listed by the FCC. Given the way the principal community system works, however, that is like comparing apples to oranges.  The proper method is to compare the 724 individual communities listed by the FCC for Illinois with the total number of communities listed by Warren for Illinois;

[24]In many instances, Warren's "system" and the FCC's community list are identical, for if a "system" only serves one community, then there is only one possible place to list the data.

[25]This is an inaccurate statement.  Every community in the Factbook is listed separately, state by state, in alphabetical order.  What is not listed separately under each community name is the factual data about the cable system serving that particular community—this data is listed under the principal community listings only.

in other words, include not only the principal communities listed, but also those that are listed and are cross-referenced to one of the 406 principal communities. Our count of the total number of communities listed for Illinois by Warren, both principal and nonprincipal, is approximately 1,000. Therefore, Warren seems to have included not only all that the FCC listed, but also some others that the FCC did not.[26]

The Second Circuit has noted that "[s]election implies the exercise of judgment in choosing which facts from a given body of data to include in a compilation." *Key Publications, Inc. v. Chinatown Today Publishing Enters., Inc.,* 945 F.2d 509, 513 (2d Cir.1991). In *Key Publications,* the record indicated that the compilation copyright holder did not include the entire relevant universe in her directory; she testified that she chose to exclude certain businesses based on her belief that they would not remain open for very long. As the court noted, "[t]his testimony alone indicates thought and creativity in the selection of businesses included in the 1989-90 Key Directory." *Id.* Warren, to the contrary, has failed to make such a showing in this case. It did not exercise any creativity or judgment in "selecting" cable systems to include in its Factbook, but rather included the entire relevant universe known to it. The only decision that it made was that it would not list separately information for each community that was part of a multiple-community cable system; in other words, it decided to make the Factbook commercially useful. Therefore, it cannot prevail in its claim that it "selected" which communities to include in its Factbook.[27] The district court erred

_____

[26]A likely explanation for this numerical disparity is that Warren lists not only names of towns, villages, and cities, but also townships and counties. Therefore, this results in a greater number of listings than the FCC, which seems to list by town, city, or village name only. These additional listings in the Factbook are cross-referenced to the principal community for the area, but they are nonetheless individually listed by Warren, albeit with a one-line entry.

[27]On an alternative ground, Warren's claim of copyright in its selection of communities does not survive application of the merger doctrine. "Under the merger doctrine, "expression is not protected in those instances where there is only one or so few ways of expressing an idea that protection of the expression would effectively accord protection to the idea itself.' " *BellSouth,* 999 F.2d at 1442 (quoting *Kregos v. Associated Press,* 937 F.2d 700, 705 (2d Cir.1991)). If Warren were given protection in its principal community system, the concept of cross-referencing would be subsumed in its copyright. The idea of organizing by principal community yields very few ways, if not only one way, of expressing the data. Each SSO has only one principal community. Each MSO has one obvious principal community. For the compilation to be convenient and useful, not repetitive and onerous, however, the nonprincipal communities in each MSO must be cross-referenced to the principal community with the data

in determining that Warren's system of selecting communities was copyrightable.

2. *The Originality Requirement*

Even were we to assume that the presentation of the selection of principal communities made by Warren was creative and original and therefore copyrightable, its claim that it is entitled to protection would nonetheless fail, because the selection is not its own, but rather that of the cable operators. The district court found that the principal community was "selected by contacting the cable operator to determine which community is considered the lead community within the cable system." R4-36-10. As we observed in *BellSouth,* "these acts are not acts of authorship, but techniques for the discovery of facts."[28] 999 F.2d at 1441.

In *BellSouth,* a case involving a "yellow pages" classified business directory, we held that Donnelley Information Publishing, Inc. ("Donnelley"), "[b]y copying the name, address, telephone number, business type, and unit of advertisement purchased for each listing in the BAPCO [BellSouth Advertising & Publishing Corporation] directory ... copied no original element of selection, coordination or arrangement," and thus Donnelley was entitled to summary judgment on BAPCO's copyright infringement claim.[29] *Id.* at 1446. The en banc court stated that "[w]hile

---

listed only under the principal community. The people for whom the Factbook and similar products are produced are not interested in having information repeated under every community served by a multiple-community system. Consequently, expression of the principal community selection has merged with the idea, and thus the selection of principal communities is uncopyrightable.

[28]The dissent takes several opportunities to describe in substantial detail Warren's "acts of selection." Dissent at 2153-55, 2158, 2159. It should be noted, however, that analysis of the compiler's acts of selection is relevant only to determine whether the compiler exercised any individual judgment that is equivalent to creativity. *See BellSouth,* 999 F.2d at 1441. The industriousness of the collection is not relevant to a determination of copyrightability. *Feist,* 499 U.S. at 359-60, 111 S.Ct. at 1295, 113 L.Ed.2d 358. "The fact that a finding of creativity is subjective often means the court can apply a "sweat' recognition of the developer's labor and ignore the creativity requirement." Charles Von Simson, Note, *Feist or Famine: American Database Copyright as an Economic Model for the European Union,* 20 Brook J. Int'l. L. 729, 768 (1995). The court in this opinion, as in *BellSouth,* does not succumb to the urge to allow industrious collection to substitute for creativity.

[29]The dissent questions the wisdom of this court's en banc decision in *BellSouth.* Dissent at 2160 n.6. The dissent notes "considerable criticism" of the opinion and cites a student note to show support for this contention. Dissent at 2160 n.6. Another student note, however, considered the en banc decision to be consistent with *Feist,* stating that "[t]he first appellate decision demonstrate[d] the way sympathy for the effort expended by the compiler will lead

BAPCO may select the headings that are *offered* to the subscriber, it is the *subscriber* who *selects* from those alternatives the headings under which the subscriber will appear in the directory. The headings that actually appear in the directory thus[ ] do not owe their origin to BAPCO...." *Id.* at 1444. In this case, Warren employed a method similar to that of BAPCO in "selecting" the principal community heading under which to list the data for the multiple-community systems.[30]

Lynn Levine, the Director of Market Research and Data Sales for Warren, stated in her deposition that Warren determines the names of the communities served by a cable system by contacting the operators of the cable systems and asking them which communities they serve. Levine dep. at 53. In addition, she stated that Warren, in gathering data for the Factbook, relied in "great part" on the questionnaire responses received from the various cable operators. *Id.* at 35. These acts are nothing more than techniques for the discovery of facts. Simply because Warren may have been the first to discover and report a certain fact on cable systems does not translate these acts of discovery into acts of creation entitled to copyright protection.[31] *See Feist,* 499 U.S. at 347, 111

---

some courts to find creativity in anything. The second appellate decision exemplifie[d] proper application of *Feist's* creative selection." Von Simson, 20 Brook. J. Int'l L. at 748.

[30]As noted before, in the case of a single-community system, there is only one community served and therefore only one possible principal community. Thus, no argument can be made regarding the selection of the principal community in the case of a single-community system. The record shows that in the Illinois section of the Factbook, approximately fifty-five percent of the principal communities are single-community systems. For the remaining principal communities, which are all part of multiple-community systems, Microdos contends that over two-thirds of them are simply the community in the multiple-community system that, according to FCC records, has the highest number of subscribers. En Banc Brief of Appellants at 37-38. Warren cannot make any tenable argument regarding selection in these instances either, given that their "selection" is nothing more than discovery of facts that are contained in the publicly-available FCC records.

The dissent seems to argue that creativity exists because the principal community could be determined in more than one way. Specifically, the cable system operators could be contacted to identify their principal communities or the principal community could be determined by external factors, like the number of subscribers. Dissent at 2158-59. The dissent ignores the fact that these methods are likely to identify the same principal community—without necessitating any judgment on the part of Warren. For example, a cable operator is likely to designate its principal community as the community with the most subscribers.

[31]For a compilation to be creative, and hence copyrightable, the compiler must exercise individual judgment. *Key Publications,* 945 F.2d at 513. The dissent makes much of the fact that Warren was the first to organize a comprehensive directory of cable systems by principal

S.Ct. at 1288, 113 L.Ed.2d 358 (distinguishing creation from discovery). "Just as the Copyright Act does not protect "industrious collection,' it affords no shelter to the resourceful, efficient, or creative collector." *BellSouth,* 999 F.2d at 1441.

The record indicates that it is the cable operators, not Warren, that determine, in the case of a multiple-community system, the community name under which to list the factual data for the entire cable system. Therefore, Warren cannot prevail in its claim that it undertakes original selection in employing the principal community concept. Rather, it has created an effective system for determining where the cable operators prefer to have the data listed. While Warren may have found an efficient method of gathering this information, it lacks originality, which is the *sine qua non* of copyright. *See Feist,* 499 U.S. at 345, 111 S.Ct. at 1287, 113 L.Ed.2d 358. Thus, the district court erred in finding that Warren's principal community "system" was sufficiently creative and original to be entitled to copyright protection.

### III. CONCLUSION

The district court erred in granting Warren a preliminary injunction based on its erroneous

---

community rather than by discrete community that represented the franchising entity. The dissent suggests that Warren newly defined the industry because the industry originally developed around these franchising entities. Dissent at 2152. The evolution of the industry, however, did not develop around franchising units but around geographically distinct areas. The Supreme Court in *Turner Broadcasting System, Inc. v. F.C.C.,* 512 U.S. 622, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) reviewed the development of the industry: "The earliest cable systems were built in the late 1940's to bring clear broadcast television signals to remote or mountainous communities. The purpose was not to replace broadcast television but to enhance it." *Id.* at 627, 114 S.Ct. at 2451, 129 L.Ed.2d 497. Thus, although acknowledging that cable systems depended on the express permission of local governing authorities since "[t]he construction of th[e] physical infrastructure entail[ed,] the use of public right-of way and easements," the Supreme Court recognized that geography and population, rather than franchising entities, influenced the location and extent of early cable television systems.

Even if the industry was newly defined, as the dissent contends, when Warren organized cable systems under principal communities, however, the creative element is still lacking in Warren's compilation. The mere discovery of an organizing principle which is dictated by the market is not sufficient to establish creativity. "The distinction is one between creation and discovery: The first person to find and report a particular fact has not created the fact; he or she has merely discovered its existence." *Feist,* 499 U.S. at 347, 111 S.Ct. at 1288, 113 L.Ed.2d 358. The same can be said for an organizing principle like the "principal community." Thus, even if Warren discovered the existence of the principal community as an organizing concept, Warren did not create this organization.

ruling on the principal community selection issue. Although the record indicates that Microdos's choices as to where to list the factual data on cable systems had an extremely high correlation with Warren's principal community listings, Microdos copied no original selection, coordination, or arrangement of Warren's factual compilation. Warren thus failed to show a substantial likelihood of success on the merits. We therefore VACATE the preliminary injunction entered by the district court and REMAND for proceedings consistent with this opinion.

GODBOLD, Senior Circuit Judge, dissenting, in which HATCHETT, Chief Judge, and BARKETT, Circuit Judge, join:

The district court understood this case. It held that Warren's compilation of selected data concerning cable television operations, in the form of data-reporting units with each unit named for a principal community within the unit, was original and creative. Its decision should be affirmed.

## I. Introductory

The Copyright Clause of the Constitution provides that Congress has the power to secure to authors "the exclusive Right to their respective Writings." U.S. Const. art. I, § 8, cl. 8. Therefore originality—authorship—is a constitutional requirement. By 17 U.S.C. § 102 Congress provided for copyright protection to original works of authorship. 17 U.S.C. § 103 provides that § 102 includes compilations. 17 U.S.C. § 101 defines compilation:

> A "compilation" is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship.

Thus, originality is also a statutory requirement.

Warren's compilation was held by the district court to be protected as an original work of authorship "selected" pursuant to § 101. It is a work containing data on cable television operations nationwide, issued annually in book form, entitled *Television and Cable Factbook,* and the volume in question is the 1988 edition. It contains collected data selected and assembled into reporting units each of which comprises a functional "cable system," which Warren defines as: "an entity composed as one or more communities that are offered the same service by the same cable system owner at the same price." Each "cable system" bears the name of a "lead" or "principal" community within the system. That name identifies the cable system, and data for the system is presented under that

name.[1] To simplify the evidence the parties have accepted that evidence concerning cable television operations in the state of Illinois is representative.

Understanding Warren's compilation, and this case, requires one to understand that cable television service exists by authority of franchises granted by organized governmental units, usually cities and counties. The district court found how, prior to Warren's work, the various compilers of industry data commonly compiled and arranged information concerning cable television operations:

> Warren Publishing admits that the cable system information coordinated and arranged by the various compilers in the industry is commonly organized alphabetically by state and then alphabetically by community within the states.

Dist.Ct.op. p. 10. This common form of organizing and presenting data is not surprising since franchises to operate sprang from discrete communities. Moreover, this accords with Federal Communications Commission definitions. FCC defines a "cable television system" as a facility that provides cable service to subscribers "within a community." 47 C.F.R. § 76.5(a). Also, it defines a "cable television system" as one that "operates ... within a separate and distinct community." 47 C.F.R. § 76.5(dd). Type and extent of service, rates, commonality of service with other communities, and sharing of facilities or equipment or staff or management are not elements of FCC definitions of cable systems.

As the industry developed innumerable new cable operations were franchised and activated, some contiguous to existing franchises, others disassociated and far distant from previously franchised communities, some operators with a single franchise, others with more than one. Over time cable operations were sold, merged, expanded in area, mechanical equipment was shared, and staff and servicing combined or shared. Geographic areas of service changed. But the industry norm for selecting and presenting data remained the community.

Against this background one must examine what, in a general sense, a compiler does and, in a specific sense, what Warren as compiler did. The creator of a compilation responds to a perceived need for information, and that response may be a highly creative act but at this initial stage

---

[1]As the district court succinctly put it, "how one defines a "cable system' will dictate the communities selected to represent those systems [i.e., the principal communities]." Dist.Ct.op. p. 10.

it is only an idea and clearly not copyrightable. William S. Strong, *Database Protection After Feist v. Rural Telephone Co.,* 42 J. Copyright Soc'y U.S.A. 39, 47 (1994). Responding to the perceived need the compiler must choose the facts it wants and devise a framework for the data to be assembled, which includes formulating rules and identifying categories that may be highly selective but are not necessarily so. *Id.* Categories desired may be limited or dictated by their utility or by the marketplace and hence involve no originality, or they may be original to the compiler. It is at this identification/formulation of categories stage that the compiler moves from uncopyrightable idea to acts of selection that are the expression of his ideas.

Warren grasped the "perceived need for information" reflecting the present nature of the cable television industry and the past practices of the industry for selecting and presenting data. It then chose the facts it wanted to compile. The Supreme Court has recognized this choice of facts as part of a compiler's authorship: "The compilation author typically chooses which facts to include, in what order to place them, and how to arrange the collected data so that they may be used effectively by readers." *Feist Publications, Inc. v. Rural Service Co., Inc.,* 499 U.S. 340, 348, 111 S.Ct. 1282, 1289, 113 L.Ed.2d 358 (1991). See also *Key Publications, Inc. v. Chinatown Today Publishing Enters., Inc.,* 945 F.2d 509, 513 (2d Cir.1991), "Selection implies the exercise of judgment in choosing which facts from a given body of data to include in a compilation."

At the initial stage of choosing the facts that it wanted Warren moved from idea to intellectual expression through selection. The selection of facts it wanted were not the facts that previously the industry had compiled in terms of community. Rather Warren chose to select and present facts that reflected the way the industry is currently actually operating. Its choice was reflected in functional service/operations/management terms. The building block, the data-reporting unit, for selection and presentation of industry data was the "cable system" as newly defined by Warren, "an entity composed as one or more communities that are offered the same service by the same cable system owner at the same price." Warren had, as *Strong, supra,* has described it, devised a framework for the data to be assembled and had formulated selective rules and categories. Reporting data by a functional unit was a new and original concept, and the implementing definition

of "cable system" was new to the industry and crafted by Warren.

Next, it was necessary for Warren to define and identify the universe of raw data from which it would select and present information. It chose a universe composed of all geographic communities (in the state of Illinois, the representative state) having cable television service. This defined universe was itself new. It consisted of 1,000 plus geographic communities (1,017 by one count, 1,045 by another). It included cities, towns, and villages, and also included counties and townships, which historically were not usual franchise-granting units. The FCC maintained its own list of cable systems (as it defined them), composed of cities, towns and villages, that is, franchise-granting units. FCC's universe was 724 communities. Warren's functional/operational definition swept in non-franchising geographic areas receiving service. Its universe of raw data was thus new in concept and some 40% larger in number of communities than the FCC universe.

As its next step Warren identified and selected from its universe 406 data-reporting units in Illinois, each a "cable system" pursuant to its functional definition. Then, drawing from the 1,000 plus universe, Warren had to identify and properly locate within the proper unit of the 406 each geographic community enjoying cable service. More than half of the 406 Illinois cable operations turned out to be single-system operations (SSO's), that is, each served only a single community. A multiple community system (MSO) served more than one community. Each SSO, because of its singularity, fell within Warren's same operator/same service/same price definition of a cable system. The name under which its data was presented was necessarily that of the single community it served. Having located within the proper cable system (MSO or SSO) each community served, for MSO's Warren had to merge or combine the operating data for each community into one unitary body of operating data to be reported for the system. Data relating to each geographic community served was no longer independently listed community-by-community but instead was included in the unitary system data. The name of an individual (nonprincipal) geographic community whose service was operated and managed as part of a cable system appeared but without data and was cross-referenced to the system where its data was included in the unitary data. This referencing was necessary, of course, because data-reporting was unitary rather than individual.

As part of Warren's acts of selection it was necessary for it to choose a name by which each cable system would be listed and identified and under which the system data would be set out. For this purpose Warren elected to use a geographic name, and the type of geographic name it chose was that of the "lead" or "principal" geographic community within the system. Obviously, for an SSO the name of the single community served was selected. When these acts were concluded Warren's selection (406 units) consisted of 45% fewer data-reporting units than the FCC's listing of 724.

## II. Originality and creativity

We are faced in this case with what *Feist* described as the "undeniable tension" between two well-established propositions—that facts themselves are not copyrightable but compilations of facts generally are. 499 U.S. at 344-45, 111 S.Ct. at 1286-87. A compilation draws its originality from its selection and arrangement.

> Factual compilations, on the other hand, may possess the requisite originality. The compilation author typically chooses which facts to include, in what order to place them, and how to arrange the collected data so that they may be used effectively by readers. These choices as to selection and arrangement, so long as they are made independently by the compiler and entail a minimal degree of creativity, are sufficiently original that Congress may protect such compilations through the copyright laws. Nimmer § § 2.11[D], 3.03; Denicola 523, n. 38. Thus, even a directory that contains absolutely no protectable written expression, only facts, meets the constitutional minimum for copyright protection if it features an original selection or arrangement. See *Harper & Row [v. Nation Enterprises]*, 471 U.S., [539] at 547, 105 S.Ct., [2218] at 2223, [85 L.Ed.2d 588]. Accord, Nimmer § 3.03.

*Id.* at 348, 111 S.Ct. at 1289. The originality necessary to render Warren's work copyrightable lies in its selection of data as provided by § 101. The selection must be done "in such a way" that it possesses the necessary originality.

What does "originality" mean? The selection must be made independently by the compiler, not copied, and must owe its origin to the author. Novelty is not required. But selection must entail a minimal degree of creativity.[2]

How much originality is required? *Feist* tells us: "a modicum of intellectual labor," 499 U.S. at 347, 111 S.Ct. at 1288; "independent creation plus a modicum of creativity," *id.* at 346, 111

---

[2]It is of only semantic significance whether originality is defined as embodying creativity or whether creativity is regarded as a necessary adjunct to originality. But it is clearer to refer to them as separate elements. Nimmer, § 201[B], p. 2-15.

S.Ct. at 1288;  "at least some minimal degree of creativity," *id.* at 345, 111 S.Ct. at 1288;  "the requisite level of creativity is extremely low;  even a slight amount will suffice," *id.* at 345, 111 S.Ct. at 1288.  Nimmer expresses the degree of originality this way:

> It has been said that all legal questions are in the last analysis questions of degree, requiring judicial line drawing.  Certainly, copyright law is replete with such questions.  The determination of the *quantum* of originality necessary to support a copyright presents such a question.  It is not, however among the more troublesome questions of degree inherent in copyright law, as the line to be drawn includes almost any independent effort on the side of sufficient originality.

Melville B. Nimmer and David Nimmer, *Nimmer on Copyright* § 2.01[B], at 2-13 (1996).  And

> [O]riginality for copyright purposes amounts to ... little more than a prohibition of actual copying.

Nimmer, § 2.01B[, p. 2-14 (quotes and internal quotes omitted)].  *Accord, Key Publications, supra,* at 513.

Warren's selection entails more than the required degrees of originality and creativity. Warren saw the need, chose the facts it wanted to compile, chose how it wanted to arrange them in gathering points for data rather than by individualized presentations.  It employed a new concept of gathering cable data into a smaller number of units and, for this purpose, it devised a new concept of a cable system as functionally defined and a new concept (and new title) of "principal community."  It is sufficient if there is a "small spark of distinctiveness," but this is no small spark. It is a fundamental change in reporting data of a changing and developing industry.  The fact that some of the data-reporting units were SSO's does not diminish the fact of Warren's acts of selection or of the originality and creativity of the selection, which required Warren to determine whether each of the 1,000 plus systems was a single community system (SSO) or part of a multiple community system (MSO) and to assemble and report system data accordingly.

Along with originality of selection and arrangement is a related but different requirement. The Constitution authorized protection of the work of an author.  The claimant to copyright protection must be an author, not a mere discoverer of facts.

> No one may claim originality as to facts.  Facts may be discovered, but they are not created by an act of authorship.  One who discovers an otherwise unknown fact may well have performed a socially useful function, but the discovery as such does not render him an "author" in either the constitutional or statutory sense.

*Nimmer,* § 2.11[A], p. 2-172.16 (footnotes omitted). But by hypothesis a compiler collects and assembles the work of others, and his compilation is a "work formed by the collection and assembly of preexisting material." See 17 U.S.C. § 101.

In the tension between facts and compilation of facts there are some facts that cannot trigger copyrightability. In a narrow range of circumstances facts themselves may be of such character that a work relating to them is incapable of meeting the requirement of a "work of authorship" referred to by the Constitution and by the statute. These might be called "public domain facts," known to or available to the world at large. *Feist,* at pp. 347-48, 111 S.Ct. at pp. 1288-89, refers to census data, scientific and historical and biographical facts, and news of the day. Professor Nimmer refers to scientific facts as to the nature of the physical world, historical facts, and contemporary news events. *Nimmer,* § 2.03[F], at p. 2-36. Regulations covering "Registration of Claims to Copyright" provide in 37 C.F.R. § 202.1:

> Material not subject to copyright
>
> ...
>
> (d) Works consisting entirely of information that is common property containing no original authorship, such as, for example: Standard calendars, height and weight charts, tape measures and rulers, schedules of sporting events, lists or tables taken from public documents or other common sources.

Another narrow range of facts do not fit neatly within the "public domain" category but nevertheless are so obvious or trivial that no creativity will transform mere selection of them into copyrightable expression. *Nimmer* § 201[B], p. 2-14. In *Feist,* the telephone company's white page directory alphabetically listed telephone users by name, town and telephone number. 499 U.S. at 362, 111 S.Ct. at 1296. The subject matter was not original with the telephone company, and the company's use of the facts through alphabetical listing was not only unoriginal but practically inevitable. *Id.* at 363, 111 S.Ct. at 1297. The Supreme Court "ultimately reversed [in *Feist* ] on the ground that plaintiff's white pages directory was not copyrightable at all." Jane C. Ginsburg, "*No Sweat* "? *Copyright and Other Protections of Information after Feist v. Rural Telephone,* 92 Colum. L.Rev. 338, 342. In *BellSouth Adv.& Pub. Corp. v. Donnelley Info. Pub., Inc.,* 999 F.2d 1436 (11th Cir.1993) (en banc), BAPCO's heading structure, for example, "Attorneys" or "Banks", represented

such obvious labels for the entities appearing beneath that they lacked the required originality for copyright protection.

### III. The opinion of this court

Apart from two lesser points discussed in Parts V and VI below, the opinion of this court has these main premises:

(1) The Factbook does not come within the "selection" prong of the § 101 definition of a "compilation" because no selection has been made (by anybody), since the Factbook lists all geographic communities having cable service.  (Mss. pp. 22-26.)

(2) Assuming that the Factbook is sufficiently creative and original to be copyrightable, Warren's claim of protection fails because:

(a) Warren seeks copyright protection for mere *techniques* for discovery of facts.

(b) The selection of principal communities was made by cable operators and not by Warren. Therefore, Warren does not meet the constitutional requirement that it be the "author" of the compilation, rather it is engaged in mere discovery of facts.

I take these up in the above sequence.

> *(1) The premise that the Factbook contains no selection at all because it lists the universe composed of all geographic communities having cable service.*

It is puzzling that this argument is seriously advanced.  It is a play on words such as "listing" and "including" and it confuses the universe of data with the data drawn from the universe.  As noted in the opinion of this court, (Mss. p. 26), the district court itself recognized that a list of a universe (in that reference, FCC's universe) would of itself not be original and, therefore, not copyrightable. Warren claims no copyright on the universe, and the district court found no copyright on such a list. Warren claims, and the district court found, a copyright on the selection of data drawn from the universe.  Definition of a universe of data was an essential initial step in selection, but no claim is made that the universe by itself is copyrightable as a selection.  The district court's references to "selected communities" are plainly references to communities as selected and presented through Warren's 406 cable-system data-presenting units.

*Key Publications, supra,* tells us that selection implies the exercise of judgment in choosing

which facts from a given body of data to include in a compilation. 945 F.2d at 513. There the compiler's universe consisted of a multitude of businesses that she thought of interest to Chinese-Americans. The infringer urged that the compiler had made no selection but had included every business of which she had information. The court found that she had excluded businesses she thought might not remain open for very long, and this alone indicated the necessary thought and creativity. *Id.* The compiler did not list the universe, only the selected businesses. This court suggests that Warren has no copyright protection because it "included" its universe as well as its selected data. This misconceives the work of selection. All communities were selected, some identified and located in MSO's, others in SSO's.

> *(2) The premise that, assuming that the Factbook is sufficiently creative and original to be copyrightable, Warren's claim of protection fails because:*

> *(a) The premise that, as in BellSouth, Warren seeks copyright protection for mere techniques for discovering facts.*

This is a baffling premise. In *BellSouth* the district court had described acts that BAPCO performed as alleged "acts of selection"—geographic limits, closing dates for entries, requiring yellow page subscribers to use business telephone service, and use of marketing techniques such as free listings and on-site visits. On appeal this court found that the district court had erred in not considering whether these alleged acts of selection met the level of originality, therefore it examined the acts. 999 F.2d at 1441. This court then held that through these strategies and marketing techniques BAPCO had learned that subscribers described their businesses in particular manners in yellow page listings and would pay for listings under certain business categories. The strategies and techniques used by BAPCO were not selected facts at all in the copyright sense but were merely creative means used to discover the facts it wanted to learn, merely industrious means for collecting data. These "uncopyrightable formative acts used to generate [the] listings were not entitled to copyright protection." *Id.* at 1441.

Warren seeks no copyright on the means it used to find out facts. It has no strategies or

marketing techniques. As acts of selection it collected facts in the old-fashioned way.[3] It collects

data from trade publications, FCC records and reports, newspaper and magazine clipping services.

Each year it sends "thousands and thousands" of questionnaires to over 10,000 cable operators in

the country, which are used to identify changes from the preceding year and to update. If a system

does not respond or responds inadequately Warren telephones the operator to obtain update data.

It follows leads to new systems. A staff of over 20 people spend the entire year gathering data,

inputting, checking, conferring and updating. It confirms with some operators the geographic areas

they are currently serving. It contacts some operators to inquire what community is considered to

be the lead or principal community. These are all fact-gathering techniques. None is claimed to

enjoy copyright protection.

> *(b) The premise that the selection of principal communities was made by cable operators and not by Warren, therefore, Warren does not meet the constitutional requirement that it be the "author" of the compilation, rather it is engaged in mere discovery of facts.*

First, as a matter of fact did Warren delegate to operators the choice of principal

communities? The district court found "[t]he principle community used to represent the entire

system, is then selected by contacting the cable operator to determine which community is

considered the lead community within the cable system." (Op. 10.) This court draws upon that

statement to conclude that Warren has made no selection of principal communities or that it accepts

as conclusive operators' consideration of what are principal communities of their respective cable

systems. This single sentence by the district court does not bear the weight of this court's

conclusions. The phrase "contacting the cable operator to determine" the principal community was

used by a witness. Elsewhere a witness explained that a call might be made to an operator to

determine *in conjunction with the operator* the identity of the principal community. Moreover, this

court's conclusions are inconsistent with Microdos' position. Before the panel Microdos asserted

that the choice of the principal community is controlled by external objective factors. It urged that

---

[3]This court suggests (n. 27) that Warren's acts of selection merely show industriousness, which is not relevant to copyrightability. To the contrary, Warren's acts of selection are examined, just as this court in *BellSouth* examined BAPCO's acts of selection, 999 F.2d at 1441, to determine whether those acts met the level of originality to extend copyright protection.

the principal community is the one with the greatest number of subscribers. It has suggested the principal community is the "largest," which it infers to be the most populous because, Microdos says, it will generate the most subscribers. It has asserted that the lead community is the site of the headend (the location of equipment used to process television signals for redistribution to cable subscribers).[4] Also, Microdos has strenuously urged that Warren draws the identity of the principal community from data it finds in Federal Communications Commission reports. Additionally, in its petition for rehearing en banc it has called the court's attention to Atlanta as the principal community for its cable service, chosen, Microdos says, because it is the dominant municipal area served and everybody knows that it is the principal community. It is obvious that these objective factors are relevant to determining the identity of the principal community of a cable system, and Microdos accordingly has relied upon them.[5] But this court has laid all these aside as having no significance, indeed as though never uttered, in favor of its own conclusion that it is the cable operators, not Warren, that determine in the case of a multiple community systems, the community name under which to list the pertinent data for the entire cable system. (Mss. p. 33.)

Alternatively, this court proposes (n. 29) that a cable operator is "likely" to designate as its principal community the community with the most subscribers, therefore no exercise of judgement was required by Warren to select the principal communities. I have pointed out the many factors asserted by Microdos itself as relevant to selection of the principal community. Neither the record, nor Microdos, supports the "likelihood" that the principal community will be the one with the most subscribers, nor the statement (n. 26) that every MSO has one "obvious" principal community. That may be so as to Atlanta ("everybody knows it is the principal community"), but a study of some 406

---

[4]Television signals may be received by satellite, by microwave tower, or by telephone lines from television stations. Microwave towers generally are located on high ground that may be unrelated to other facilities of the operator and not necessarily even in the area served by the cable system. Many systems have multiple headends. It has been suggested that "lead" community means the site of the managerial headquarters of the system, where a customer, salesmen for cable equipment, or a potential advertiser may seek the manager or the engineer or the sales manager. But managerial headquarters is not necessarily even in the area served, and examination of Illinois systems in the Factbook shows that frequently it is not.

[5]Other relevant factors are miles of cable and numbers of homes passed in a particular community.

principal communities in Illinois, most of them smaller towns and cities, discloses no such "obvious" character.

This court (Mss. p. 31) analogizes Warren's contacts with operators to what it describes as the "similar" selection of headings made by telephone users in *BellSouth*. But, as *BellSouth* noted, the headings offered to BAPCO subscribers did not originate with BAPCO but were obvious and unoriginal labels for business categories such as "Attorneys" or "Banks." 999 F.2d at 1445. The BAPCO subscriber ordered from an unoriginal menu of business categories the menu item it liked and would pay to be listed under in the yellow pages. Warren's category, "principal community," is neither obvious nor unoriginal. The cable operator in this case was asked for operational information about how his business was currently functioning, to be listed in an operations directory. The extensive objective factors advanced by Microdos itself demonstrate relevant criteria that bear on this industrial directory listing.

Moreover, this court has focused upon the selection of the principal community, whose name the system will bear, as though that is all that the case is about. The acts of selection carried out by Warren were a stream of events, beginning with its choice of the facts it wanted and the construct of a functional methodology in which to develop and present them. The use of a geographic name for each cable system, and the choice of the names of principal communities as identifiers, and the decision on a particular name, were not isolated acts of selection like Athena springing full grown from the brow of Zeus, or a decision made by a snap of someone's fingers, or a mechanical decision from a single telephone call, or by numerous calls. They were parts of the stream of acts of selection that I have described. This court does not, however, refer to Warren's exercise of judgment in creating this structure of selection and in choosing the facts to be reported and how to report them. Yet these acts of selection are independent expressions of the author, part of the overall "work of authorship."[6] This court does not hold them to be unoriginal or non-creative. Instead, it ignores

---

[6]The selections made of categories—"cable system," "principal community,"—are by themselves, acts of selection that meet requirements of originality. *CCC Information Services, Inc. v. Maclean Hunter Mkt. Reports, Inc.,* 44 F.3d 61 (2d Cir.1994), held copyrightable a compilation of the compiler's predictions of used car valuations based upon market data and the compiler's judgment and expertise. One of the elements of originality held to pass *Feist* 's

them and treats this case as turning on the single fact of the source of information about principal communities. This trivializes what this case is about.

Laying aside the foregoing, I turn to this court's conclusion that Warren does not meet the requirements of authorship because it is a "mere discoverer" of facts. The difference between mere discovery of facts by Warren and authorship by Warren cannot be based on the single fact that Warren is engaged in collecting information. All compilers are collectors of facts collected from some other source. If the fact of collecting data from an original source deprives a compiler of authorship status, all the vitality is drained out of the congressional provision for copyright of compilations in §§ 101 and 102. Warren's status as author versus mere discoverer requires examination of the nature of the facts discovered. If they are "public domain" facts, or such facts as by their nature cannot support originality, Warren is not an author. If, however, Warren has collected facts that are capable of supporting originality, and it meets the statutory requirements for selection and presentation, then both statute and the constitutional provision for originality (authorship) are met. The linchpin of *Feist* is the nature of the underlying facts (names, towns and telephone listings) that would not support copyrightability. *BellSouth* has the same linchpin: headings, such as "Attorney" and "Banks" that were not original expressions of an author but mere facts, obvious if inevitable classifications drawn from the public domain. In both cases, *Feist* and *BellSouth,* the compiler was gathering information that would not support copyrightability.

Warren's facts do not fit into these narrow categories of uncopyrightable facts. Data on how businesses in a growing and changing industry are owned, operated and managed is not public matter like today's news event, or the speed of a falling object, or the face of the calendar, nor is it unoriginal subject matter open to and utilized by the world at large like the telephone listings of *Feist.* Its facts are functional data of a changeable and changing industry, structured in a new and

threshold was the use of the abstract concept coined by the compiler, of the "average" vehicle in each category. *Id.* 44 F.3d at 67. The Second Circuit held the compilation was protected and that the district court erroneously applied a higher standard of originality than *Feist. Kregos v. Associated Press,* 937 F.2d 700 (2d Cir.1991), concerned a form that displayed statistics on the recent past performances of baseball pitchers scheduled to start the next day's games. The compiler's selection of statistics survived summary judgment motion alleging lack of originality.

original format. Its gathering of these facts from original sources is authorship, not mere discovery.

*U.S. Payphone, Inc. v. Executives Unltd. of Durham, Inc.,* 18 U.S.P.Q.2d 2049, 1991 WL 64957 (4th Cir.1991), is a per curiam with Justice Powell on the panel. The compiler assembled and summarized public information on state tariffs regulating fees payable to telephone utilities by owners and operators of pay telephones. The summarized information was presented in the format of one sheet for each state. The court found:

> Payphone's selection and organization of the state tariff material was sufficiently subjective and original to make the Tariff Section copyrightable material.

18 U.S.P.Q.2d at 2051, 1991 WL 64957.

## IV. *BellSouth* does not ring for this case

It is understandable that judges of this court wish to be faithful to the en banc decision in *BellSouth*. But we need not extend it. I gather in one place the reasons this decision is not controlled by *BellSouth*.

(1) *BellSouth* concerned uncopyrightable facts, obvious headings drawn from the public domain. This case does not.

(2) The district court in *BellSouth* found that the compiler's establishment of the geographic limits of its directory and of a closing date for listings were acts of selection. This court found these were uncopyrightable acts common to compilations. 999 F.2d at 1441. There are no such acts in the present case.

(3) In *BellSouth* this court found that the district court had erred in treating as copyrightable facts that were not copyrightable facts at all but merely techniques for the discovery of facts—marketing techniques and sales strategies. Warren has no such techniques and strategies and it relies upon selection and presentation of facts.

(4) Much of the *BellSouth* decision concerns BAPCO's claims of originality based upon the coordination and arrangement provisions of § 102. 999 F.2d at 1442-44. These issues are not present in this case. The district court ruled against Warren on coordination and arrangement, and this holding is not an issue in this appeal.

(5) BAPCO failed to establish that its structure of headings was "original expression," that

is, that it was the author of the headings such as "Attorneys" and "Banks." Without question Warren is the creator of the heading "principal community," a name previously unknown to the industry and implicating the concept of a data-reporting unit previously unknown. *BellSouth* found that an expressive act of dividing such obvious categories as "Attorneys" into subcategories (such as bankruptcy lawyers and criminal lawyers) merged into the idea of listing in a directory the subtitles as a class of business. 999 F.2d at 1444. There are no such subdivisions in this case, and, as discussed below in Part VI, merger does not fit, indeed does not even come close, to this case.

(6) At the heart of *BellSouth* is the single fact of the subscriber's selecting an appropriate heading from the menu of obvious and unoriginal headings. The selection involved in the present case is a stream of original and nonobvious acts only one aspect of which involves choice of names for data-reporting units.[7]

### V. Use of the word "system" does not bar copyrightability

The district court used the word "system" in referring to Warren's acts of selection, and the panel opinion by this court fell into the same phraseology. 17 U.S.C. § 102(b) tells us that copyright

---

[7]While I do not suggest that *BellSouth* be abandoned, it has drawn considerable criticism. Wood, Ethan L., *Copyrighting the Yellow Pages: Finding Originality in Factual Compilations,* 78 Minn. L.Rev. 1319, 1335 (1994): "The Eleventh Circuit's approach directly contradicts Key Publications" [discussed above in text].... "The Eleventh Circuit opinion in *BellSouth* is much more hostile than Key Publications to claims of copyright infringement of the yellow pages." *Id.* at 1333. "The Eleventh Circuit's *BellSouth* decision used a standard of originality that is inconsistent with the Supreme Court's approach in *Feist*." *Id.* at 1336. "[T]he Eleventh Circuit has raised the threshold of required originality higher than the *Feist* decision established." *Id.* at 1337. And finally, "[U]nlike the Eleventh Circuit, the Second Circuit, which has traditionally been the most influential in developing copyright law, properly follows the *Feist* approach." *Id.* at 1339 (footnote omitted).

See also *Nimmer* § 3.04[B], p. 3-31 (footnotes omitted):

Most applications of *Feist* have recognized the circumscribed sphere to which its holding applies, ruling that it invalidates the copyright only in the most banal of works, such as the white pages of a copybook.

Other post-*Feist* decisions cannot be squared with *BellSouth.* See *CCC Information Services, Inc. v. Maclean Hunter Mkt. Reports, Inc.,* 44 F.3d 61 (2d Cir.1994), in footnote 5, *supra.*

See also *U.S. Payphone, Inc. v. Executives Unltd. of Durham, Inc.,* 18 U.S.P.Q.2d 2049, 1991 WL 64957 (4th Cir.1991), discussed above in Part III.

protection for an original work of authorship does not extend to a "system." This court relies upon § 102[b] as a bar to copyrightability. Neither district court nor the panel addressed § 102(b), and one may infer that both courts used the word "system" in a generic, everyday sense and not as a word of art under § 102(b).

In any event, § 102(b) is not, as this court describes it, a "limiting principle." In the leading case, *Toro Co. v. R. & R. Products Co.,* 787 F.2d 1208, 1212 (8th Cir.1986), the claimant asserted a copyright on its use of a "system" of numbering in its catalog replacement parts for lawn care machines. The district court denied copyrightability on the ground that the claim was for a "system." The court of appeals rejected the view that literal use of the term "system" from § 102(b) is a "limiting principal."

> [Section 102(b) ] is nothing more than a codification of the idea/expression dichotomy as it developed in the case law prior to passage of the 1976 Act. H.R.Rep. No. 1476, 94th Cong., 2d Sess. 57, *reprinted in* 1976 U.S.Code Cong. & Ad.News 5659, 5670 (*"Section 102(b) in no way enlarges or contracts the scope of copyright protection under the present law.* Its purpose is to restate ... that the basic dichotomy between expression and idea remains unchanged.") (Emphasis added.)

*Id.* at 1212. The court held the claimant's copyright not valid, based on the idea/expression dichotomy; i.e., claimant could not copyright the *idea* of using numbers to designate replacement parts. And its *expression* of that idea simply drew numbers from the public domain and, without rhyme, reason, or judgment, arbitrarily assigned them to parts. The expression of the idea did not meet the requirement of originality. See *Nimmer* § 203(D), p. 2-35, to the same effect as *Toro.* It seems beyond argument that Warren does not seek copyright protection on the *idea* of gathering and selecting data and reporting it in a manner that responds to the perceived needs for functional data of a changeable and changing industry. Rather it seeks a copyright on its *expression* of that idea.

The opinion of this court recognizes that the use of the term "system" does not preclude copyrightability. But, the court says, Warren's acts of selection were in fact a "system," and that fact creates a bar. (n. 21). In the first place, the district court made no such finding, nor does the evidence address it. Second, this contention is contrary to what Congress itself has said. See quotation, above, H.R. Report No. 1476. If what the copyright claimant has done is an expression of sufficient originality that it is entitled to copyright, calling it a "system" does not strip it of

copyrightability.

VI. The doctrine of merger does not bar copyrightability

By footnote this court suggests the merger doctrine as an alternative ground for denying copyrightability. Merger operates where there is only one or so few ways of expressing an idea that protection of the expression would effectively accord protection to the idea itself. The court suggests that Warren's principal community presentation is one, if not the only, commercially useful way of organizing a compilation of information on the cable television industry, so the presentation is merged with the idea of a cable television directory.

This is another puzzling point. As has been said repeatedly, Warren's reporting data by principal community units is a total departure from prior methods utilized in the industry. No one—industry or government—has previously assembled and presented functional data drawn from the way the industry presently operates and is managed. Presumably, for many users, Warren's way of selecting and presenting data is the most useful way. But there are many ways.

The television industry is driven by the advertising dollar, and advertisers place their dollars by numbers and types of viewers, based in part on information that includes numbers of homes reached by cable. Seekers of cable data may wish to utilize data compiled community-by-community, as, for example, an equipment salesman will wish to know whether discrete communities within a service area utilize differing equipment. A compiler may wish to organize cable television data by counties, by areas of the state ("upstate" and "downstate"), by adjoining communities, by agricultural areas, by urban and rural areas, by big systems and smaller systems, large cities and small towns, high income and low income areas, sports-oriented areas and less interested areas. Nor does cross-referencing change the picture. Warren cross-references and groups data by service/management. Another compiler may group and cross-reference agricultural areas or high income areas. It may group and cross-reference all cable operations that use a particular manufacturer of equipment.

Warren's selection of data is original, creative and useful. To suggest it is the only conceivable useful way is astonishing. The FCC listed 724 communities in Illinois versus Warren's

selected 406, based on different criteria. The Broadcast Yearbook, another recognized directory of the industry, listed 243 communities in Illinois. Different organizations create lists different in structure, scope and number that may be useful for different readers for varying purposes. Merger does not fit.

## VII. Conclusion

The district court correctly decided this case, and we should affirm its decision. Our statutes provide rational and economically useful copyright protection for compilations. If that protection is to be narrowed and cabined the choice is for Congress, not the courts.